**GIRARD TRUST CORN EXCHANGE BANK, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Civ. A. No. 24544.**

United States District Court
E. D. Pennsylvania.

March 2, 1961.

Christopher Branda, Jr., Philadelphia, Pa., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., Washington, D. C., Lyle M. Turner, Jerome Fink, Robert H. Kapp, Attorneys, Department of Justice, Washington, D. C., Walter E. Alessandroni, U. S. Atty., Department of Justice, Philadelphia, Pa., for defendant.

CLARY, Chief Judge.

This matter is presently before the Court on plaintiff's and defendant's cross-motions for summary judgment. Plaintiff seeks to recover a claimed overpayment of Federal Income Tax in the amount of $9,494.02 resulting from the disallowance of a loss which plaintiff suffered in 1952 upon the sale of certain shares of its own stock.

The facts, to which both parties to this action have agreed, and all the facts necessary for decision here, are as follows: Girard Trust Corn Exchange Bank is a banking corporation organized and existing under the laws of the Commonwealth of Pennsylvania. On June 15, 1951, the Corn Exchange National Bank and Trust Company, a national banking association, merged with the Girard Trust Company, pursuant to Federal and Pennsylvania banking laws. Coincident with the merger, Girard Trust Company, the surviving corporation, changed its

name to Girard Trust Corn Exchange Bank, the taxpayer herein. The joint plan of merger provided that each outstanding share of Corn Exchange capital stock was to be converted into one share of $15 par value capital stock of the surviving institution. Under the Federal statute authorizing the merger, shareholders of the Corn Exchange voting against the merger were entitled to receive the cash value of their shares as of the effective date of the merger.

At the time of this merger, holders of 5,802 shares of Corn Exchange capital stock, who had voted against the merger, demanded that the taxpayer pay them the value of their shares as of May 31, 1951, the date upon which the proposed merger was approved. The dissenting shareholders, in accordance with the procedure outlined in Federal banking law, applied directly to the Comptroller of the Currency to value their shares which he determined on July 11, 1952 to be $57.43 as of May 31, 1951. On June 29, 1951, and October 15, 1952, the plaintiff purchased, in two blocks, all the outstanding shares in the hands of the dissenters. All shares were purchased at the price fixed, or to be fixed, by the Comptroller of the Currency. The market value of this stock as of May 31, 1951 was $47.50 per share.

Two thousand five hundred shares were purchased from one of the dissenters on June 29, 1951, for which the taxpayer paid a total of $144,702.95. The remaining 3,302 shares were acquired on October 15, 1952 at a price of $183,364. The certificates representing the acquired shares were, in each instance, immediately cancelled by the plaintiff. After each purchase, the officers and directors of the plaintiff considered whether to hold the stock for speculation in the market, or to immediately reissue and sell the shares, thereby promptly cleaning up the situation. They chose to do the latter. Accordingly, the 2,500 shares were sold on July 2, 1951, three days after purchase, for $116,366.25. Similarly, the 3,302 shares were sold in two blocks: 2,500 on Oc-

tober 16, 1952, the day following purchase, at a price of $133,091.14; and 802 shares the following month at a price of $44,094.08.

On its 1952 Income Tax return, the taxpayer sought to deduct $36,515.48 as a loss from the sale of capital assets, this amount representing the difference between the payments made to dissenting shareholders and the amounts received on the issuance of the new shares. The District Director of Internal Revenue disallowed the loss of $36,515.48. Accordingly, a deficiency was assessed against the taxpayer. Plaintiff paid the deficiency and filed a timely claim for refund of $9,494.02, plus interest, with the District Director, which claim was rejected on March 13, 1958. Plaintiff then instituted the present action.

The decision of this matter rests upon an interpretation of Treasury Regulation 118, Section 39.22(a)–15, promulgated under the Internal Revenue Code of 1939, which is set forth in part below:

"Sec. 39.22(a)–15. *Acquisition or disposition by a corporation of its own capital stock.*

"(a) Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. * * *

"(b) However, if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. * * * Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of the Internal Revenue Code."

The issue presented, therefore, is whether the taxpayer, Girard Trust Corn Exchange Bank, on the facts here involved, was dealing in its own shares as

it might deal in the shares of another corporation within the meaning of Section 39.22(a)–15 of Treasury Regulation 118.

Before deciding this question, however, it is interesting to note, in passing, that under the Internal Revenue Code of 1954 such an issue would be moot. Title 26 U.S.C.A. § 1032(a) reads:

"(a) *Nonrecognition of gain or loss.*—No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including Treasury stock) of such corporation."

Both the Senate Report (No. 1662) and the House Report (No. 1337) on this section, at pages 5069 and 4410 of the 1954 United States Code Congressional and Administrative News, stated that the purpose of this new section is to remove the uncertainties of present law.

At the time Section 1032 was enacted there is no doubt that the law was uncertain as to the question here involved. However, it is believed, though plaintiff contends otherwise, that the problem was subsequently resolved in 1955 by the Supreme Court of the United States in United States v. Anderson, Clayton and Company, 350 U.S. 55, 76 S.Ct. 25, 100 L.Ed. 43.

The circumstances leading up to the Anderson, Clayton and Company case have been very ably presented by counsel for the Government in its brief, summarized as follows.

Prior to 1932, the law with respect to recognition of taxable gain or loss on the acquisition and sale of a corporation's own capital stock was relatively clear. The Commissioner's Regulations provided (as does the 1954 Internal Revenue Code today), that no gain or loss was realized from a corporation purchasing or selling its own stock. This clarity was removed by the First Circuit in Commissioner of Internal Revenue v. S. A. Woods Mach. Co., 57 F.2d 635, where it was held that the receipt of the taxpayer corporation's own shares in settlement of a patent controversy gave rise to taxable gain. The Court said that whether the acquisition or sale by a corporation of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction involved and if it was in fact a capital transaction, i. e., if the shares were acquired or parted with in connection with a readjustment of the capital structure of the corporation then there is no tax impact; but, if the corporation has legally dealt in its own stock as it might in the shares of another corporation, then there is no reason why the gain or loss should not be taken into account in computing the taxable income.

The decision in this case created the need for a redrafting of the Commissioner's Regulations governing this type situation. This need was almost immediately satisfied with the regulation presently in controversy, couched in language almost identical to that used in S. A. Woods Mach. Co., supra.

In the abundant litigation fostered by the Woods regulation, a conflict in interpretation was quick to develop between the Tax Court and the Court of Appeals. The Tax Court literally applied the plain language of the Regulations and examined the real nature of the transaction considering all the facts and circumstances in determining whether the transaction resulted in taxable gain or loss. The position was maintained that if the Treasury shares were not treated as assets and not purchased as an investment or for the purpose of resale at a profit, but for some intracorporate purpose, such as (1) for the sale to its officers or employees under an incentive profit-sharing plan, (2) for adjusting respective holdings of different officers or directors, and later the stock was sold either to carry out that purpose or to further some other corporate purpose, such as (3) to provide necessary capital for an expansion or replacement program, in which the element of profit on the resale was incidental, the corporation did not deal in its own shares as it might, in the shares of another corporation, and the resulting gain was nontaxable.

In short, the test generally was whether the corporation was speculating in its own shares, seeking a profit on resale, or whether the transaction was motivated by some intracorporate purpose, any gain or loss on resale being merely incidental.

The Courts of Appeals, however, construed the Regulations to mean that regardless of the original purposes of the corporation in purchasing its shares, if it does not legally cancel and retire the purchased shares under state law but later sells them, regardless to whom they are sold or for what purpose, the corporation has sold an asset in the same way as when it sells the shares of another corporation, and any resulting gain is the same type of taxable income as would result from the profit derived upon the sale of any other asset. Plaintiff has relied almost entirely upon this line of Courts of Appeals' decisions, all of which were made prior to United States v. Anderson, Clayton and Company, supra, e. g. Commissioner of Internal Revenue v. Landers Corp., 6 Cir., 1954, 210 F.2d 188; Commissioner of Internal Revenue v. H. W. Porter & Co., 3 Cir., 1951, 187 F.2d 939; Commissioner of Internal Revenue v. Rollins Burdick Hunter Co., 7 Cir., 1949, 174 F.2d 698; and Commissioner of Internal Revenue v. Batten, Barton, Durstine & Osborn, Inc., 2 Cir., 1948, 171 F.2d 474.

It should be pointed out here that while this conflict was indeed substantial, the Tax Court and the Courts of Appeals were one in asserting that no gain or loss is realized in transactions connected with a readjustment of the corporate capital structure of the corporation.

As was previously mentioned, it is believed that the conflict to which we refer was resolved by the Supreme Court of the United States in the Anderson, Clayton and Company case, supra. In fact, Mr. Justice Minton declared, 350 U.S. at page 57, 76 S.Ct. at page 26, of the opinion, that certiorari was granted because of the claim of conflict between the Tax Court decisions and those of the Courts of Appeals. Later, 350 U.S. at page 60, 76 S.Ct. at page 28, of the opinion, two cases relied upon by plaintiff were rejected in theory.

Anderson, Clayton and Company was engaged in the cotton merchandising business and had, in 1930, 100,000 shares of common stock outstanding. In 1931, a written agreement was entered into between the corporation and the common stockholders, the purpose of which was to restrict the ownership to the management group as responsibility changed. Accordingly, the agreement provided that the stockholders could not dispose of their stock without the written consent of the holders of 75% of the stock and that upon the death of any party to the agreement, the corporation agreed to purchase the common stock of the deceased at its book value as of July 31 preceding the shareholder's death. Any common stock purchased by the corporation under the agreement could be sold to the remaining parties or to any other person whom the owners of 75% of the remaining stock might designate.

In 1939, the major shareholder of the corporation died. His shares were purchased by the corporation in accordance with the 1931 agreement. This stock was placed in the Treasury and was not retired. Subsequently, those same shares were sold to company officials at a price in excess of that paid for them by the corporation. The Government sought to treat this excess as a taxable long-term capital gain on the theory, premised on the Courts of Appeals' decisions, that the stock not having been retired, the corporation dealt with these shares as it might have dealt with another corporation's stock. The Court of Claims rejected this argument and instead applied the Tax Court doctrine to deny taxability. Anderson, Clayton & Co. v. United States, 1954, 122 F.Supp. 837, 129 Ct.Cl. 347. Upon writ of certiorari to the Supreme Court, the Court of Claims was affirmed. The Supreme Court said:

"Thus, whether the transaction here in question is taxable depends,

in the final analysis, on whether respondent corporation dealt with its shares of treasury stock 'as it might' have dealt with another corporation's stock.

"The Court of Claims ruled, after a thorough examination of all of the facts and circumstances surrounding the transaction, that the corporation was not dealing in its shares as it might in the shares of another corporation. * * *

"We agree with the Court of Claims. Here the purchase and sale were made pursuant to a contract entered into without any shown purpose of advantageous investment. * * * No consideration was given to the opportune time for purchase or sale. The purchase of Mr. Anderson's stock by the Corporation was dictated by the terms of the Contract upon the fortuitous circumstance of his death. Moreover, when purchased, the stock was lodged in the Treasury. It could not be taken into account in any payment of dividends, nor voted in shareholder meetings, nor counted for the purpose of establishing a quorum. These unrecognized rights are all incident to the ownership of common stock of other corporations. It is thus clear that respondent was not dealing in its shares as it might in the shares of others." 350 U.S. at pages 59, 60, 76 S.Ct. at page 28.

In the Court of Claims' case, Anderson, Clayton & Co. v. United States, supra, the Court stated, 122 F.Supp. at page 842:

"The Commissioner's position that income may be realized by a corporation on the sale of treasury stock may be justified on the ground that as a practical matter some corporations do deal in their own stock just as though it were an asset, buying it, holding it as an investment, and selling it at opportune times. That is the type of situation that we believe the portion of the regulation here in question covers."

And, 350 U.S. at page 60, 76 S.Ct. at page 28, of United States v. Anderson, Clayton and Company, supra, Mr. Justice Minton said:

"The Government urges that the crucial inquiry as to whether the transaction is taxable under the regulation depends for its answer upon whether the reacquired shares are resold or retired and new shares issued; since the shares were not retired, the resale at a price greater than costs results in a taxable gain under § 22(a) of the Code and the applicable regulation. The Government receives comfort for its position in the language of Commissioner of Internal Revenue v. Batten, Barton, Durstine & Osborn, Inc., 2 Cir., 171 F.2d 474, 476, and Commissioner of Internal Revenue v. Landers Corp., 6 Cir., 210 F.2d 188, 191. But we do not think formalities should be raised to such an important position. Moreover, the applicable regulation provides that tax consequences depend upon 'the real nature of the transaction, which is to be ascertained from all its facts and circumstances,' and not upon the sole circumstance that the stock is not retired. When viewed in its entirety, the instant transaction, limited to a wholly intracorporate purpose with no element of speculation or gain envisioned from dealing in its shares, does not constitute dealing by the corporation in its own shares as it might deal in the shares of another corporation within the meaning of the regulation."

█ With the groundwork laid by the Supreme Court and the Court of Claims, we must now decide whether plaintiff in the instant action was dealing in its shares as it would in those of another corporation. Although we sympathize with plaintiff in the loss it has sustained because of the value set on the dissenters' shares by the Comptroller of the Currency, we do not think it can be said

that they (i. e., the offices and directors of plaintiff) were dealing in these shares as they would in those of another corporation.

In the instant action plaintiff did not acquire these shares voluntarily either for advantageous investment or any speculative purpose as would be the case in the acquisition of shares of another corporation. Rather, they were forced to acquire them by Federal statutory provisions. Moreover, the shares were reissued almost immediately after acquisition upon the decision by corporate officials that it would be better not to speculate in these shares.[1] Such action indicates to us that the shares were not acquired nor were they held as an investment with the thought of selling at some opportune future date so that a gain might be realized.

Plaintiff contends, however, that the holding in United States v. Anderson, Clayton and Company, supra, is a very narrow one and the instant case does not fall within its purview. It is argued that the Anderson, Clayton & Co. case applies only to transactions "limited to a wholly intracorporate purpose". For authority plaintiff draws our attention to Rev.Rul. 60–328, I.R.B.1960–42, p. 14, the official headnote of which reads:

"Where the acquisition and disposition of treasury stock by a corporation is limited to a wholly intracorporate purpose with no element of speculation or gain envisioned, it does not constitute dealing by the corporation in its own shares as it might deal in the shares of another corporation within the meaning of Section 39.22(a)–15 of Regulation 118."

Plaintiff submits that since the acquisition and resale of the shares was not wholly for an intracorporate purpose, the loss should be recognized by the Government as deductible. Plaintiff asserts that the disposition of its stock was for a wholly extracorporate purpose, i. e., to realize as much as possible from the sale, and the decision to sell was primarily dictated by market conditions for plaintiff's stock.

The distinction between extracorporate and intracorporate purpose is not clear. However, it would be fair to say that a transaction of an extracorporate nature is one that cannot be directly traced to the internal affairs of the corporation. Rather, it is something that the corporation does that any individual might himself do to realize a material gain outside of his own business or profession. It is readily discernible here that plaintiff acquired these shares for a wholly intracorporate purpose, i. e., the merger. Perhaps if plaintiff had held these shares for a longer period of time with the thought of realizing a gain, rather than disposing of them almost immediately, a different result would be reached.

Further, we do not believe, as plaintiff contends, that Anderson, Clayton & Co. established such a narrow test as that suggested by the plaintiff, i. e., whether there is a taxable gain or loss depends on whether the transaction is limited to a wholly intracorporate purpose. We believe the test is a much broader one. That enunciated in Hercules Powder Co. v. United States, 180 F. Supp. 363 (1960), is more appropriate. In that case Judge Madden, at page 366, said:

"The problem in a particular case would seem to be, then, how much does the activity of the corporation look like the activity of an outside investor and speculator in its stock. A slight resemblance would seem to be insufficient to justify the distinction."

We are convinced that the activity of plaintiff here certainly does not look like the activity of an outside invester or speculator in its stock and that the

---

1. Mr. J. Malcolm Johnston, an officer of the plaintiff, stated several times in his oral deposition that the reason for the immediate resale was to "clean up the matter."

transactions do not constitute dealing by the corporation in its own shares as it might in the shares of another corporation within the meaning of the Regulation.

The motion of the plaintiff for summary judgment will be denied and that of the defendant granted.